Plaintiff's Name __Lovell Colvin__

Prisoner No. __C-51010__

Institutional Address __1 Main Street [1W15]__
__San Quentin, CA 94974__
_____

**FILED**

1/10/2022

**CLERK, U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

__LOVELL COLVIN,__
_(Enter your full name)_
v.

__STATE OF CALIFORNIA, et al.,__

_____

_____

_(Enter the full name(s) of all defendants in this action)_

Case No. __22 cv 00186 LB__
_(Provided by the clerk upon filing)_

**COMPLAINT BY A PRISONER**
**UNDER THE CIVIL RIGHTS ACT,**
**42 U.S.C. § 1983**

## I. Exhaustion of Administrative Remedies.

_You must exhaust available administrative remedies before your claim can go forward. The court will dismiss any unexhausted claims._

A. Place of present confinement __San Quentin State Prison__

**B.** Is there a grievance procedure in this institution?   ☐ **YES**   ☐ **NO**

C. If so, did you present the facts in your complaint for review through the grievance procedure?
☒ **YES**   ☐ **NO**

D. If your answer is YES, list the appeal number and the date and result of the appeal at each level of review. If you did not pursue any available level of appeal, explain why.

    1.   Informal appeal: _____

    _____

    2.   First formal level: __81356, unavailable, Disapproved.__

    _____

    _____

3.   Second formal level: 81356, 11/13/21, No response, Time
Expired.

4.   Third formal level: CDCR no longer requires, nor has, a
Third Level Review.

E.  Is the last level to which you appealed the highest level of appeal available to you?
☒ YES          ☐ NO

F.  If you did not present your claim for review through the grievance procedure, explain why.

## II. Parties.

A.  If there are additional plaintiffs besides you, write their name(s) and present address(es).

B.  For each defendant, provide full name, official position and place of employment.
See paragraphs 4 through 18 of attached Complaint for Damages
and Declaratory Relief, and Demand for Jury Trial.

## III. Statement of Claim.

State briefly the facts of your case. Be sure to describe how each defendant is involved and to include dates, when possible. Do not give any legal arguments or cite any cases or statutes. If you have more than one claim, each claim should be set forth in a separate numbered paragraph.

See paragraphs 24 through 57 of attached Complaint for Damages
and Declaratory Relief, and Demand for Jury Trial.

## IV. Relief.

Your complaint must include a request for specific relief. State briefly exactly what you want the court to do for you. Do not make legal arguments and do not cite any cases or statutes.

See pages 45 to 46 of attached Complaint for Damages abd

Declaratory Relief, and Demand for Jury Trial.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on: __December 20, 2021__     _____
             *Date*                        *Signature of Plaintiff*

Lovell Colvin
#C-51010, 1W15L
CSP San Quentin
1 Main Street
San Quentin, CA 94974

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

LOVELL COLVIN,
      Plaintiff,

V.

STATE OF CALIFORNIA; CALIFORNIA
DEPARTMENT OF CORRECTIONS AND
REHABILITATION (CDCR), an agency of the State
of California; SAN QUENTIN STATE PRISON, a
CDCR state prison; RALPH DIAZ, former Secretary
of CDCR, in his individual capacity; ESTATE OF
ROBERT S. THARRATT, former Medical Director of
CDCR, in his individual capacity; RONALD DAVIS,
Warden of San Quentin State Prison, in his individual
capacity; RONALD BROOMFIELD, Acting Warden of
San Quentin State Prison, in his individual capacity;
CLARANCE CRYER, Chief Executive Officer of San
Quentin State Prison, in his individual capacity; ALISON
PACHYNSKI, M.D., Chief Medical Executive of San
Quentin State Prison, in her individual capacity;
SHANNON GARRIGAN, M.D., Chief Physician and
Surgeon of San Quentin State Prison, in her individual
capacity; LOUIE ESCOBELL, R.N., HealthCare Chief
Executive Officer of California Institute for Men (CIM),
in his individual capacity; MUHAMMAD FAROOQ, M.D.,
Chief Medical Executive for CIM, in his individual capacity;
KIRK TORRES, M.D., Chief Physician and Surgeon for
CIM, in his individual capacity; and DOES, 1 through 20,
individually, jointly and severally,
      Defendants.

Case No. ___22-cv-00186-LB_____

**COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF,
AND DEMAND FOR JURY TRIAL**

1

Plaintiff, by his Complaint against Defendants, state as follows:

## JURISDICTION

1.      This is a civil rights action arising from dangerous conditions at San Quentin State Prison caused by Defendants' intentional and deliberately indifferent decisions and conduct, resulting in physical and mental harm against Plaintiff LOVELL COLVIN, on or about June 10, 2020. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343(a)(3)-(4) because it is being brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of persons in the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. §§1983 and 1988. This action is brought pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution, the Rehabilitation Act ("RA") 29 U.S.C §794, and the laws and Constitution of the State of California. Plaintiff further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C §1367(a), to hear and decide claims arising under state law.

2.      Venue in this judicial district is proper, pursuant to 28 U.S.C. §1391(b), because a substantial part of the events, actions, and/or omissions giving rise to the claims occurred at San Quentin State Prison, in the County of Marin, California.

## PARTIES AND PROCEDURE

3.      Plaintiff LOVELL COLVIN, is a citizen of the United States and a competent adult.

4.      At all material times, Defendant STATE OF CALIFORNIA employed all individual Defendants in this action, and all individual Defendants acted within the course and scope of their employment. The claims set forth below are also brought by Plaintiff on the basis of 42 U.S.C.

2

§§1983 and 1988, the U.S. Constitution, the Rehabilitation Act, and federal and state civil rights law.

5.      At all material times, Defendant STATE OF CALIFORNIA employed all individual Defendants in this action, and all individual Defendants acted within the course and scope of their employment. Defendant STATE OF CALIFORNIA is properly named as a Defendant for Plaintiff's disability discrimination claims under the RA.

6.      At all material times, Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR"), was an agency of the State of California.

7.      At all material times, Defendant SAN QUENTIN STATE PRISON ("SAN QUENTIN"), was a State of California prison under CDCR.

8.      At all material times, Defendant RALPH DIAZ was the State of California Secretary, and highest policymaking official, of CDCR. On information and belief, he was ultimately responsible for the oversight, management, policies, procedures, provision of services, and supervision of all employees and agents of CDCR, including employees and agents of SAN QUENTIN, the California Institute for Men ("CIM") and all other prisons under CDCR's authority, including in relation to preventing and handling contagious disease outbreaks at SAN QUENTIN. On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN, and the creation of highly dangerous conditions for prisoners putting them at high risk for contracting COVID-19 without proper or adequate safety or disease precautions and without legally required protection. Through his direct involvement, decisions, and conduct, he affirmatively placed San Quentin prisoners in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin prisoners,

3

including Plaintiff, to it. At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

9.      At all material times, ROBERT S. THARRATT, M.D., was the Medical Director and a policymaking official of CDCR who, on information and belief, was responsible for medical-related oversight, management, decisions, policies, procedures, provision of services, hiring and supervision of CDCR employees and agents, and for preventing and handling contagious disease outbreaks at SAN QUENTIN. On information and belief, he was personally involved in the decision(s) to send CIM prisoners to San Quentin in May, 2020, the manner in which that prisoner transfer was done, the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN, and the creation of highly dangerous conditions for prisoners and putting them at high risk for contracting COVID-19 without proper or adequate safety or disease precautions and without legally required protection. Through his direct involvement, decisions, and conduct, he affirmatively placed San Quentin prisoners in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin prisoners, including Plaintiff, to it. At all material times, DR. THARRATT was employed by the State of California, and acted within the course and scope of that employment. As ROBERT S. THARRATT is now deceased, Plaintiff has named his estate- ESTATE OF ROBERT S. THARRATT-as Defendant in this action.

10.     At all material times, Defendant RONALD DAVIS was the Warden of SAN QUENTIN. On information and belief, when he was Warden, he was the highest policymaking official of SAN QUENTIN, responsible for the oversight, management, hiring, decisions, policies, procedures, provision of services, and supervision of all employees and agents of SAN QUENTIN. He was also ultimately responsible at San Quentin for the safety and health of all inmates at SAN QUENTIN, and preventing and handling contagious disease outbreaks at SAN

4

QUENTIN. On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, the manner and location of housing assignments for inmates at San Quentin, the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN, and the creation of highly dangerous conditions for inmates, putting them at high risk for contracting COVID-19 without proper or adequate training, safety or disease precautions, and without legally required protection. Through his direct involvement, decisions, and conduct, he affirmatively placed San Quentin inmates in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin inmates, including Plaintiff, to it. At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

11.     At all material times, Defendant RONALD BROOMFIELD was the Acting Warden of SAN QUENTIN. On information and belief, when he was Acting Warden, he was the highest policymaking official of SAN QUENTIN, responsible for the oversight, management, hiring, decisions, policies, procedures, provision of services, and supervision of all employees and agents of SAN QUENTIN. As Acting Warden, he was also ultimately responsible at San Quentin for the safety and health of all inmates at SAN QUENTIN, and preventing and handling contagious disease outbreaks at SAN QUENTIN. On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, the manner and location of housing assignments for inmates at San Quentin, the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN, and the creation of highly dangerous conditions for inmates, and put them at risk for contracting COVID-19 without proper or adequate safety or disease precautions. Through his direct involvement, decisions, and conduct, he affirmatively

5

placed San Quentin inmates in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin inmates, including Plaintiff, to it. At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

12.     At all material times, Defendant CLARENCE CRYER was the Chief Executive Officer for Health Care ("CEO") of SAN QUENTIN. On information and belief, he was a policymaking official concerning medical care and health at SAN QUENTIN, and served as a principal advisor in institution-specific application of health care policies and procedures. On information and belief, he was also responsible for: planning, organizing, and coordinating the implementation of the health care delivery system at SAN QUENTIN; supervising health care program managers responsible for administrative services within health care; ensuring adequate resources are requested to support health care operations; and preventing and handling contagious disease outbreaks at SAN QUENTIN. On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, the manner and location of housing assignments for inmates at San Quentin, the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN, and the creation of highly dangerous conditions for inmates, and placing them at high risk for contracting COVID-19 without proper or adequate safety or disease precautions and without legally required protection. Through his direct involvement, decisions, and conduct, he affirmatively placed San Quentin inmates in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin inmates, including Plaintiff, to it. At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

13.     At all material times, Defendant ALISON PACHYNSKI, M.D., was a licensed physician Board Certified in internal medicine, and the Chief Medical Executive of SAN QUENTIN. On information and belief, she was a policymaking official concerning medical care and health at SAN QUENTIN, and was responsible for medical-related oversight, management, policies, procedures, provision of services, supervision of all medical employees and agents, and preventing and handling contagious disease outbreaks at SAN QUENTIN. On information and belief, she was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, the manner and location of housing assignments for inmates at San Quentin, the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN, and the creation of highly dangerous conditions for inmates, and placing them at high risk for contracting COVID-19 without proper or adequate safety or disease precautions and without legally required protection. Through her direct involvement, decisions, and conduct, she affirmatively placed San Quentin inmates in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin inmates, including Plaintiff, to it. At all material times, she was employed by the State of California, and acted within the course and scope of that employment.

14.     At all material times, Defendant SHANNON GARRIGAN, M.D., was Chief Physician and Surgeon of SAN QUENTIN. On information and belief, she was a policymaking official and was responsible for medical-related oversight, management, policies, procedures, provision of services, supervision of all medical employees and agents, and preventing and handling contagious disease outbreaks at SAN QUENTIN. On information and belief, she was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, and the manner in which that inmate transfer was done, the manner and location of housing assignments for

7

inmates at San Quentin, the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN, and the creation of highly dangerous conditions for inmates, and placing them at high risk for contracting COVID-19 without proper or adequate safety or disease precautions and without legally required protection. Through her direct involvement, decisions, and conduct, she affirmatively placed San Quentin inmates in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin inmates, including Plaintiff, to it. At all material times, she was employed by the State of California, and acted within the course and scope of that employment.

15. At all material times, Defendant LOUIE ESCOBELL, R.N., was the Chief Executive Officer for Health Care ("CEO") of the California Institute for Men (CIM). On information and belief, he was a policymaking official concerning medical care and health at CIM, and served as a principal advisor in institution-specific application of health care policies and procedures. On information and belief, he was also responsible for: planning, organizing, and coordinating the implementation of the health care delivery system at CIM; supervising health care program managers responsible for administrative services within health care; and ensuring adequate resources are requested to support health care operation, and preventing and handling contagious disease outbreaks at CIM. On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, and the manner in which that inmate transfer was done. Through his direct involvement, decisions, and conduct, he affirmatively placed San Quentin inmates in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin inmates, including Plaintiff, to it. At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

16.     At all material times, Defendant MUHAMMAD FAROOQ, M.D., was Chief Medical Executive of CIM. On information and belief, he was a policymaking official concerning medical care and health at CIM, and was responsible for medical-related oversight, management, policies, procedures, provision of services, supervision of all medical employees and agents, and preventing and handling contagious disease outbreaks at CIM. On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done. Through his direct involvement, decisions, and conduct, he affirmatively placed San Quentin inmates in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin inmates, including Plaintiff, to it. At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

17.     At all material times, Defendant KIRK TORRES, M.D., was Chief Physician and Surgeon of CIM. On information and belief, he was a policymaking official and was responsible for medical-related oversight, management, policies, procedures, provision of services, supervision of all medical employees and agents, and preventing and handling contagious disease outbreaks at CIM. On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, and the manner in which that inmate transfer was done. Through his direct involvement, decisions, and conduct, he affirmatively placed San Quentin inmates in danger by acting with deliberate indifference to the known and obvious danger of an infectious disease (COVID-19) outbreak in subjecting San Quentin inmates, including Plaintiff, to it. At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

18.     The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 1 through 20 are unknown to Plaintiff, who

therefore sue said Defendants by said fictitious names. Plaintiff will amend this Complaint to show said Defendants' true names and capacities at an appropriate time when the same have been ascertained. Plaintiff is informed, believe, and thereon allege that all Defendants sued herein as DOES are in some manner responsible for the acts, omissions, and injuries alleged herein. Plaintiff allege, on information and belief, that each of the Defendants sued herein was wrongfully, deliberately indifferently, negligently, and/or otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff. Further, one or more DOE Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including both the individually named and DOE Defendants.

19.    All individual Defendants are sued in their individual capacities.

20.    Plaintiff is informed, believe, and thereon allege that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of that relationship. Plaintiff is further informed, believe, and thereon allege that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may hereinafter be otherwise, specifically alleged. At all material times, each Defendant was an integral participant, jointly and fundamentally engaged in constitutionally violative, unlawful, and/or tortious activity, resulting in the deprivation of Plaintiff's constitutional rights and other actionable harm.

21.    At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

22.     Defendants have forced Plaintiff to file this lawsuit to obtain justice and

accountability for Plaintiff's completely preventable physical and mental injury and suffering. This

action is timely filed within all applicable statutes of limitation.

23.     This complaint may be pled in the alternative, pursuant to Rule 8(d)(2) of the

Federal Rules of Civil Procedure.


## GENERAL ALLEGATIONS

24.     In the midst of a global pandemic caused by a deadly virus, corrections officials

transferred an infected inmate from a Southern California lockup to San Quentin prison, touching

off an outbreak that swept through the institution, infecting and killing people inside. That transfer

happened on April 18, 1918. The global pandemic of H1N1 in 1918 caught San Quentin

unprepared at the time, but the outbreak was well documented for future study. Unlike in 1918,

the outbreak of COVID-19 at San Quentin State Prison was predictable and, indeed, predicted. [1]

25.     Plaintiff was a 71 year old African-American at the time he contracted COVID-19 on

or about June 10, 2020, based on a COVID-19 test administered to him on June 20, 2020.

(Exhibit A) Plaintiff received notice of the positive COVID-19 test approximately mid-August 2020.

Because Plaintiff was not considered for expedited release under any of CDCR's early release

schemes in 2020, he became a part of the San Quentin Consolidated Writ Proceedings in Marin

County Superior Court seeking release from prison due to the Pandemic. (Exhibit B) Plaintiff's

Habeas laid out his robust re-entry plan that informed Defendants STATE OF CALIFORNIA,

CDCR, SAN QUENTIN, BROOMFIELD and DIAZ that Plaintiff had been accepted in to one

transitional housing program, which offers self-help groups, employment and educational

---

[1] This paragraph was excerpted from the Office of the State Public Defender's (OSPD) Amicus Letter dated August 19, 2020, to
the Honorable Geoffrey M. Howard, Marin County Superior Court, in the *San Quentin Consolidated Writ Proceeding.*

assistance and money management training. Plaintiff had, and still has, a job offer and an offer for the funding of a small janitorial business from his Brother, Mr. Christopher Keeling, and a retired Los Angeles County Sheriff's Detective, who has also offered Plaintiff a place to live. Plaintiff also had, and still has, an offer of residency and help with employment from his nephew, Christopher Keelings' son, a member of the Albuquerque, New Mexico Police Department, a support team in place to ease his transition back into society headed by Plaintiff's sister, Ollie Faye Freeman-Keeling, who has offered Plaintiff financial assistance, assistance with transportation and employment/social service acquisition upon release. Defendants STATE OF CALIFORNIA, CDCR, SAN QUENTIN, BROOMFIELD and DIAZ were also informed of Plaintiff's rehabilitative programming, which included, inter alia, completion in excess of 16 self-help groups/programs, 5 character support letters, as Plaintiff's C-File bore out. (Exhibit C)

26.    At all relevant times, it was each Defendant's duty to refrain from taking affirmative actions that create an obvious or known danger to others, including Plaintiff. And at all relevant times, Plaintiff was a member of a defined group-CDCR inmate with pre-existing medical disabilities-that was subjected to a serious risk of harm as a result of Defendants' conduct.

27.    On March 4, 2020, Governor Gavin Newsom proclaimed a State of Emergency in California as a result of the impacts of the COVID-19 pandemic. On information and belief, by that time, all Defendants had been briefed and warned about the grave danger to health and life posed by the COVID-19 outbreak, including the highly transmissible nature of the virus and the necessity for precautions to prevent its spread, including but not limited to: quarantine of those known or suspected to have been exposed to the virus, the need for cleanliness, social distancing, and personal protective equipment, and the need to regularly test for virus carriers, as many can be asymptomatic. Defendants also knew that it was virtually impossible to provide necessary social distancing inside San Quentin under then current conditions, due to tight

quarters, overcrowding of inmates, shared spaces for eating and showering, antiquated facilities with many cells having open bars instead of solid doors and walls, and poor ventilation throughout San Quentin facilities. Defendants also knew that the San Quentin population had a high proportion of older inmates compared to other correctional facilities, and due to the demographic makeup of the prison population in income, race, and education, there was a high rate of underlying chronic diseases that placed inmates at higher risk for morbidity and mortality if infected with COVID-19. Further, Defendants knew that there was no on-site hospital for critically ill inmates. Defendants also knew that many of its San Quentin residents, including Plaintiff, had medical conditions and disabilities such as obesity, hypertension, and diabetes that placed them at a high risk of mortality if they were to become infected with COVID-19.

28.     On March 16, 2020, the Health Officers of seven Bay Area Counties, including Marin County where SAN QUENTIN is located, issued shelter-in-place orders, enforceable as a misdemeanor, ordering all non-essential workers to shelter at home due to the COVID-19 pandemic. Marin County's Order stated: "All individuals currently living within Marin County ("County") are ordered to shelter at their place of residence. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain social distancing of at least six feet from any other person[]." (3/16/20 Order, ¶ 2). The Order continued, "Due to the outbreak of the COVID-19 virus in the general public, which is now a pandemic according to the World Health Organization, there is a public health emergency throughout the County. …The scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed. One proven way to slow the transmission is to limit interactions among people to the greatest extent possible." (3/16/20 Order, ¶ 6). The Order required that "All Essential Government Functions shall be performed in compliance with Social

Distancing Requirements" and defined those requirements as "maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes…, regularly cleaning high-touch surfaces, and not shaking hands." (3/16/20 Order, ¶¶ 10(d) and (j)). The Order stated, "The violation of any provision of this Order constitutes an imminent threat to public health." (3/16/20 Order, ¶ 11).

29.     On March 18, 2020, the Interim Executive Director of the Habeas Corpus Resource Center (HCRC), the State Public Defender, Mary McComb, and others responsible for representing people on death row, sent a letter to Defendants San Quentin Acting Warden RON BROOMFIELD and Chief Medical Executive ALISON PACHYNSKI. The letter implored San Quentin to provide inmates with personal protective equipment (PPE) and cleaning supplies, to avoid quarantining COVID-19 patients in punitive solitary confinement cells (rather to find or create non-punitive quarantine locations), to allow for social distancing, and other recommendations to protect the health of inmates and staff at the prison. At that time, there were no COVID-19-positive inmates or staff at San Quentin.

30.     On March 19, 2020, Governor Newsom announced a statewide shelter-in-place order, also enforceable as a misdemeanor. In that order, the Governor wrote: "[F]or the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Health."

31.     On March 24, 2020, in response to the COVID-19 outbreak, Governor Newsom issued Executive Order N-36-20, suspending intake of inmates into all facilities for 30 days. On information and belief, that order was extended beyond that initial 30 days. Reportedly, until late May, 2020, California Correctional Health Care Services (CCHCS) had opposed transfers of

inmates between prisons, saying that "mass movement of high-risk inmates between institutions without outbreaks is ill-advised and potentially dangerous" and noting that it "carries significant risk of spreading transmission of the disease between institutions."

32.    On April 17, 2020, six Bay Area Counties-San Francisco, Alameda, Contra Costa, Marin, Sonoma and San Mateo Counties-issued a mask mandate, requiring all people not from the same household to wear a face mask when in the presence of other people, punishable as a misdemeanor. By that time or within days, several other counties across the state had taken similar mandatory measures. Not just public health experts, but anyone in California vaguely paying attention to COVID-19 news and public health advice and mandates knew that COVID-19 was highly contagious, potentially deadly, and knew the basic rules to prevent COVID-19 outbreaks: avoid being in the presence of people from outside one's own household, especially inside buildings, vehicles, and other enclosed spaces; avoid public transportation; if you leave your home, wear a mask; sanitize and wash your hands constantly; sanitize surfaces, doorknobs, etc. around you with virus-killing agents when possible; report any Coronavirus symptoms you may have before entering any business or public establishment; quarantine if you develop Coronavirus symptoms or have possibly been exposed to someone with the virus; get tested for the Coronavirus frequently if possible, as many infected people can be asymptomatic. These obvious and simple public health measures were widely known by the general public in California; on information and belief, all Defendants knew this information too.

33.    On May 30, 2020, Defendants STATE OF CALIFORNA, CDCR and all Defendants herein ordered and approved the transfer of 122 people to SAN QUENTIN from the California Institution for Men in Chino, California. At that time, SAN QUENTIN still had no cases of COVID-19. By contrast, the Chino facility was struggling with a severe outbreak of COVID-19, which by then had reportedly infected over 600 inmates and killed 9 of them. Reportedly, all of the men

who were transferred had high medical risk factors. And, most or all of the men who were transferred had not been tested for COVID-19 form at least approximately three or four weeks. The transferred inmates also were not properly screened for current symptoms immediately before being placed on a bus. Those transferred inmates were packed onto buses in numbers far exceeding COVID-capacity limits that CDCR had mandated for inmate safety, where some fell ill even before they arrived at SAN QUENTIN. The transferred inmates were tested for COVID-19 *after* they arrived at SAN QUENTIN-several tested positive or already had symptoms.

34.     At SAN QUENTIN, Defendants ordered and approved the placement of the Chino inmates in the Badger housing unit, where tiers of open-air cells open into a shared atrium. On information, the Defendants who ordered and approved such placement and handling of COVID-19 exposed inmates include, but are not limited to: CDCR Secretary RALPH DIAZ, ESTATE OF ROBERT S. THARRATT, San Quentin Warden RONALD DAVIS, San Quentin Acting Warden RONALD BROOMFIELD, San Quentin CEO CLARANCE CRYER, San Quentin Chief Medical Executive ALISON PACHYNSKI, M.D., and San Quentin Chief Physician and Surgeon SHANNON GARRIGAN, M.D. The transferred inmates used the same showers and ate in the same mess hall as the other inmates. Within days, 25 of those transferred inmates tested positive for COVID-19. A COVID-19 outbreak at SAN QUENTIN quickly spread throughout the complex. Over three weeks, the prison went from having no cases to 499 confirmed cases of COVID-19.

35.     On information and belief all individual Defendants-CDCR Secretary RALPH DIAZ, ESTATE OF ROBERT S. THARRATT, San Quentin Warden RONALD DAVIS, San Quentin Acting Warden RONALD BROOMFIELD, San Quentin CEO CLARANCE CRYER, San Quentin Chief Medical Executive ALISON PACHYNSKI, M.D., San Quentin Chief Physician and Surgeon SHANNON GARRIGAN, M.D., CIM CEO LOUIE ESCOBEL, R.N., CIM Chief Medical Executive MUHAMMAD FAROOQ, M.D., CIM Chief Physician and Surgeon KIRK TORRES, M.D., and

Does 1-20-were informed and approved the transfer of high risk inmates from CIM to San

Quentin under the conditions and in the manner that the transfer actually was done. Additionally,

by that time, each of these Defendants was informed and knew about the grave dangers COVID-

19 posed in a California prison environment to inmates and staff. Each Defendant also was

informed and knew about the current COVID-19 prevention and mitigation protocols

recommended and/or ordered by health authorities, including the Centers for Disease Control,

among others.

36.    Despite actual knowledge of grave risk to San Quentin inmates, staff, and their

families, all Defendants ordered and/or approved this inmate transfer without timely, adequate

and proper testing of the men being transferred, knowing that inmates were being densely

packed onto buses far in excess of the previously ordered capacity limits, knowing that the

transfer would not be done safely and according to current medical guidelines and protocols,

knowing that the transfer would not be done in accordance with public health and county mask

mandates, and without requiring proper protocols, quarantine, PPE, distancing, proper masks,

and precautions once those transferred men were brought to San Quentin, and none of those

precautions were taken at San Quentin.

37.    On June 1, 2020, upon learning of this dangerous transfer of untested inmates to

San Quentin, Marin County Public Health (MCPH) Officer Matthew Willis, M.D., M.P.H.,

immediately recommended in a conference call that day with Defendants, including Defendant

BROOMFIELD, that all transferred inmates be completely sequestered from then native SAN

QUENTIN population. Instead, Defendants oversaw those transferred inmates being placed in a

large shared unit with existing SAN QUENTIN inmates. Dr. Willis further recommended

mandatory mask wearing for all exposed inmates and staff and that staff movement be restricted

between different housing units. On information and belief, all Defendants were timely informed

of Dr. Willis' urgent recommendations. Instead, all Defendants chose not to implement those basic safety measures, chose to violate and flout Marin County's Public Health Officer Order, and ordered and agreed that Dr. Willis be informed that local health officers like him lacked authority to mandate measures in state-run prisons, including San Quentin, which was in the county over which Dr. Willis had public health jurisdiction. On June 3, Dr. Willis recommended to Defendants that they establish an incident commander with expertise in outbreak management at SAN QUENTIN. Defendants did not institute an Incident Command until a month later on July 3, and only after the Marin County Board of Supervisors appealed to Governor Newsom for that step.

38.     On or about June 13, 2020, a group of health experts toured San Quentin at the request of the federal court-appointed medical monitor, and CCHCS Director, J. Clarke Kelso. All Defendants were informed that those experts wrote an "Urgent Memo" dated June 15, 2020, warning that the COVID-19 outbreak at San Quentin could develop into a "full-blown local epidemic and health care crises in the prison and surrounding communities." The public health experts also warned that overcrowding together with physical risk factors at San Quentin created high risk for a "catastrophic super-spreader event." There was also a grave lack of personal protective equipment and masks at San Quentin, to the point where inmates had to make inadequate masks out of cloth, and Defendants even refused to provide adequate masks and personal protective equipment (PPE) to their own staff, even though masks and PPE were easily obtainable. Prison staff and inmates were commonly not wearing masks, or were wearing them improperly. All of this was already known and tolerated by all Defendants. The public health experts warned that virus testing delays at San Quentin were far too long, pointing out that "5-6 days or more is completely unacceptable."

39.     Those public health experts further warned:

Especially given that early identification of suspected COVID-19 cases depends on reporting of symptoms, <u>quarantine strategies relying on the Adjustment</u>

18

Center or cells usually used for punishment may thwart efforts for outbreak
containment as people may be reluctant to report their symptoms. In addition,
people with COVID-19 are known to experience rapid physical decompensation;
it may therefore be particularly detrimental to a patient with COVID-19 to be
behind a solid door in the most secure areas of the prison out of sight of medical
or nursing staff in the case of an emergency. This may be particularly risky if
there are structural barriers to communicating distress to staff (e.g., if
accommodations are not readily accessible for people with disabilities or who
speak other languages, and/or there are multiple security stages to pass through).

(Emphasis in original).

40.     Those public health experts further wrote in their report: "It is important to note that

we spoke to a number of incarcerated people who were over the age of 60 and had a matter of

weeks left on their sentences. It is inconceivable that they are still in this dangerous

environment." (Emphasis in original) Those health experts recommended specific measures

needing immediate implementation, including but not limited to large-scale release or transfer of

inmates, of which all Defendants were informed and chose to disregard. Rather than release

significant numbers of at-risk inmates, all Defendants ordered and approved that sick inmates

would be moved to punitive housing assignments at San Quentin, including solitary confinement,

further exacerbating problems as many sick inmates, on information and belief, did not want to

report their symptoms and hundreds of inmates refused testing for fear of such punitive

incarceration, just as the Monitor's experts had warned.

41.     In March and again in June, 2020, Innovative Genomics Institute at Berkeley,

California, offered to provide free COVID-19 testing for SAN QUENTIN, of which all Defendants

were aware. Both times, Defendants rejected the offer. A research laboratory with UCSF Medical

Center also offered to provide COVID-19 testing and assistance to SAN QUENTIN in May and

June. All Defendants were informed and rejected those offers as well. Medical monitor Kelso later

testified that SAN QUENTIN and CDCR lacked testing resources in March and April, and by July,

still was unable to provide timely testing results. Meanwhile, Prison staff, including Sergeant

19

Gilbert Polanco (the only San Quentin staff member to die from COVID-19), were pleading for proper personal protective equipment. California Occupational Health and Safety laws required Defendants to provide N-95 respirators to San Quentin staff and inmates, including Plaintiff, which Defendants refused to provide. Instead, correctional officers were told that to the extent San Quentin had such PPE, it was reserved for medical professionals and not front-line correctional officers, supervisors and inmates. Correctional officers were relegated to wearing inmate-made masks sewn from inmate pants and other cloths or masks created at home by their loved ones because the prison would not supply such necessary PPE to staff and inmates, despite adequate availability. Prison inmates and staff were also were not being regularly tested for COVID-19. Prison staff were not trained about safety protocols for COVID-19, and were not required to follow safety protocols. In addition, Defendants took no steps to protect inmates nor their own medically vulnerable staff members, from exposure to COVID-19. All Defendants were aware of and tacitly or actively approved these obviously dangerous conditions and practices at SAN QUENTIN.

42.     At a California Senate Committee on Public Safety meeting on July 1, 2020, state senators called the March 30 transfer of inmates to San Quentin a "horribly botched transfer," a "failure of leadership," "completely avoidable," "abhorrent," and a "fiasco." A California Assembly member labeled the transfer the "worst prison health screw up in state history." Medical monitor Clark Kelso testified, "what we've done to date still is not enough." Dr. Mark Ghaly, who heads California's Health and Human Services Agency, reportedly said, "There is no dispute that more could be and should be done."

43.     On July 6, 2020, CDCR Medical Director ROBERT S. THARRETT, M.D.-whose estate is named as a Defendant in this action- was removed from his position by Medical Monitor

Kelso. Governor Newsom criticized Defendants' decision to transfer Chino inmates to San

Quentin on May 30, saying, "They should not have been transferred."

44.     By July 7, 2020, reportedly more than 1,300 inmates and 184 staff had tested

positive for COVID-19 at San Quentin. By July 30, 2020, reportedly more than 2,181 San Quentin

inmates had been infected-approximately two-thirds of the prison population there. As of

September 2, 2020, approximately 26 inmates from San Quentin, along with Sergeant Polanco,

had died due to this COVID-19 outbreak. Those deaths were preventable. A study by the

National Commission on COVID-19 and Criminal Justice found that the overall death rate from

COVID-19 was more than twice as high in California prisons as compared to the general

California population, taking into account differences in age, sex, race and ethnicity that make the

prison population more vulnerable. In contrast to California, 14 states had no COVID-19 deaths in

their prisons, and six states had lower death rates for inmates than for their overall populations.

45.     Defendant RALPH DIAZ, Secretary of CDCR, announced his retirement on August

28, 2020. Assembly member Marc Levine, D-San Rafael, whose district includes San Quentin,

concluded that day, "The spread of COVID-19 at state prisons was a preventable public health

disaster and a failure of CDCR leadership at the highest level."

46.     On October 20, 2020, the California Court of Appeal, First Appellate District,

Division Two, issued an opinion in *In re Von Staich*, 56 Cal.App.5th 53 (2020), remanded for

consideration in light of present conditions, ___ Cal.4th ___, 272 Cal. Rptr.3d 813 (Dec. 23,

2020), finding the following in connection with the COVID-19 outbreak at San Quentin and

against several Defendants herein:

> a. The San Quentin Warden and CDCR "have acted with deliberate indifference"
>
>     to the rights and safety of San Quentin prisoners (*Id.*, at 58);

21

b. "By all accounts, the COVID-19 outbreak at San Quentin has been the worst epidemiological disaster in California correctional history" (*Id.*, at 60);

c. "The catalyst of the outbreak of COVID-19 infections and deaths was the transfer by CDCR of 121 inmates from the California Institution for Men (CIM) to San Quentin" (*Id.*);

d. "[E]minent public health experts endorsed the conclusion of the Urgent Memo that inmates of San Quentin could be protected against the risks presented by COVID-19 only if the population of San Quentin was drastically reduced with dispatch" (*Id.*, at 63);

e. "The declaration filed by Dr. Chris Beyrer, professor of epidemiology, international health, and medicine at the Johns Hopkins Bloomberg School of Public Health, states it is 'self-evident from the 75% infection rate and rates of morbidity and mortality at San Quentin, that its response to the outbreak there has been a failure to protect the lives of inmates and staff. Had San Quentin done nothing, the rates of infection there would have been roughly the same. It is a disaster that could have been avoided by releasing substantial numbers of people as UCSF experts repeatedly recommended.'" (*Id.*);

f. "CDCR did not implement the 50 percent reduction deemed essential by the Urgent Memo solicited in its behalf by the federal receiver." (*Id.*, at 64);

g. "The Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution both require correctional officials to provide inmates adequate medical care." (*Id.*, at 68-69);

h. "It is doubtful any correctional agency in the United States is as familiar with the adverse consequences of mass incarceration on inmates' medical care, and the

need to prevent them, as CDCR is or should be, given its litigation of the issue in the Plata and Coleman cases since the turn of the century. Respondents [CDCR, San Quentin Warden, and other Defendants herein] concede the point and agree that responsible prison officials were 'subjectively aware' of the risk COVID-19 presents to 'inmate health or safety.'" (*Id.*, at 69);

i. "[R]espondents concede 'actual knowledge of 'the 'substantial risk of serious harm' to San Quentin inmates and accept their duty to alleviate their 'serious medical needs.'" (*Id.*, at 78)

j. "[T]he efforts Respondents have taken to control COVID-19 in San Quentin are insufficient to protect inmates from COVID-19 without the speedy reduction of the population of that prison by at least half' ... "[R]espondents' failure to accompany the measures they are taking with a drastic reduction of the prison population is not reasonable." (*Id.*, at 78-79);

k. "At a prison with 'exceedingly poor ventilation, extraordinarily close living quarters, and inadequate sanitation' due to its uniquely antiquated infrastructure, in which 75 percent of the population has been infected with COVID-19, and 28 infected inmates have recently died, the continued use of double cells and congregate living spaces is not merely negligent, it is reckless. The recklessness is aggravated by Respondents' refusal to consider the expedited release, or transfer, of prisoners who are serving time for violent offenses but have aged out of a propensity for violence (life prisoners eligible for parole and older second and third strikers)-a large and still growing class of San Quentin prisoners who are more vulnerable to COVID-19 and less likely to recidivate than the prisoners whose expedited release CDCR facilitates." (*Id.*, at 79);

l. "[R]espondents have shown deliberate indifference to the risk of substantial harm to petitioner, a life prisoner whose age makes him vulnerable to COVID-19." (*Id.*, at 80);

m. "We agree that CDCR's deliberate indifference to the risk of substantial harm to petitioner necessarily extends to other similarly situated San Quentin inmates." (*Id.*, at 81); and

n. "'Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.' 'A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.'" (citations omitted) (*Id.*, at 80).

47. On August 17, 2020, the Office of the Inspector General ("OIG") issued the first of a three-report series responding to Speaker of the California Assembly Anthony Rendon's formal request to assess CDCR's policies, guidance, and directives regarding COVID-19. In the report, titled *COVID-19 Review Series, Part One: Inconsistent Screening Practices May Have Increased the Risk of COVID-19 Within California's Prison System*, the OIG concluded that "[CDCR's] vague screening directives resulted in inconsistent implementation among the prisons, which left some staff and visitors entering unscreened." More specifically, the report emphasized the following concerns: employees moving freely in and out of the screening location, potentially interacting with individuals yet to be screened; failure to screen all employees coming in; faulty thermometers at screening stations; and lack of training for screeners. Notably, roughly seven percent of surveyed employees at SAN QUENTIN reported that they had not always been

screened before entering the prison-the highest rate among the seven institutions analyzed. OIG

staff were not screened in three of their four visits to SAN QUENTIN, and entered the Warden's

office unscreened on four occasions because it was located outside of the screening area. Forty-

seven percent of screeners at SAN QUENTIN reported that they received no screening training

at all. All screeners at SAN QUENTIN reported that they received no thermometer training, and

one SAN QUENTIN  screener reported thermometer readings as low as 80 degrees Fahrenheit.

48.      On October 26, 2020, the OIG issued its second report, entitled *COVID-19 Review

Series, Part Two: The California Department of Corrections and Rehabilitation Distributed and

Mandated the Use of Personal Protective Equipment and Cloth Face Coverings; However, Its

Lax Enforcement Led to Inadequate Adherence to Basic Safety Protocols.* The OIG concluded

that lax enforcement by CDCR supervisors and managers [which include Defendants herein]

likely contributed to noncompliance among staff members and inmates with protocols related to

face coverings and social distancing. The OIG reported that thirty-one percent of employees

surveyed at seven different prisons reported seeing employees or inmates improperly wearing

face coverings, and thirty-eight percent reported seeing employees or inmates not complying with

physical distancing requirements. SAN QUENTIN's surveyed employees reported such offenses

at rates of thirty-eight and forty-five percent, respectively. These offenses were not limited to

inmates and rank-and-file staff; the OIG report noted several instances of noncompliance (and

failure to address noncompliance) observed first-hand by OIG investigators across all levels of

prison personnel. Despite these indications and first-hand observations of widespread

noncompliance, a survey of records from five prisons *combined* revealed only 29 disciplinary

actions against noncompliant employees, only one of which was punitive. Notably, SAN

QUENTIN took only *one* disciplinary action, which the report characterized as "especially

alarming" given that more than 2,100 inmates and more than 270 staff members of SAN

QUENTIN had tested positive for COVID-19 by September 2020. The OIG concluded that lax compliance and enforcement of mask-wearing was partially due to the CDCR's characterization of the policy as an "expectation" (rather that a "mandate") and its failure to definitively direct supervisors and managers to issue corrective action for noncompliance.

49.     On February 1, 2021, the California Office of the Inspector General released its third report in the "COVID-19 Review Series," entitled: *California Correctional Health Care Services and the California Department of Corrections and Rehabilitation Caused a Public Health Disaster at San Quentin State Prison When They Transferred Medically Vulnerable Incarcerated Persons from the California Institution for Men Without Taking Proper Safeguards.* ("Third OIG Report"). In an accompanying letter to Speaker of the California Assembly, Anthony Rendon, the Inspector General wrote:

> Our review found that the efforts by CCHCS and the department to prepare for and execute the transfers were deeply flawed and risked the health and lives of thousands of incarcerated persons and staff. Insistence by CCHCS and the department to execute the transfers and subsequent pressure to meet a tight deadline resulted in the California Institution for Men ignoring concerns from health care staff and transferring the medically vulnerable incarcerated persons, even though the vast majority had not been recently tested for COVID-19. With outdated test results, the prison had no way to know whether any of the incarcerated persons were currently infected with the virus. According to email conversations that we reviewed, a California Institution for Men health care executive explicitly ordered that the incarcerated persons not be retested the day before the transfers began, and multiple CCHCS and departmental executives were aware of the outdated nature of the tests before the transfers occurred.

> In addition to the department transferring the medically vulnerable incarcerated persons despite outdated tests, prison health care staff conducted verbal and temperature screenings on multiple transferring incarcerated persons too early to determine whether they had symptoms of COVID-19 when they boarded the buses. As a result, some of the incarcerated persons may have been experiencing symptoms consistent with COVID-19 when they left the prison. The risk of placing some symptomatic incarcerated persons on the busses was exacerbated by another inexplicable decision approved by CCHCS executives to increase the number of incarcerated persons on some buses, thus decreasing the physical distance between them, and increasing the risk that the virus could spread among the incarcerated persons and staff on the buses.

> Once the incarcerated persons arrived at San Quentin, nursing staff immediately noted that two of the incarcerated persons arrived with symptoms consistent with COVID-

19. Nonetheless, the prison housed almost all of the incarcerated persons who arrived from the California Institution for Men in a housing unit without solid doors, allowing air to flow in and out of the cells. By the time the prison tested the incarcerated persons for COVID-19, many of those who tested positive had been housed in the unit for at least six days. The virus then spread quickly through then housing unit and multiple areas throughout the prison. The prison's inability to properly quarantine and isolate incarcerated persons exposed to or infected with COVID-19, along with its practice of allowing staff to work throughout the prison during shifts or on different days, likely caused the virus to spread to multiple areas of the prison. According to data the department provided to support its COVID-19 population tracker, by the end of August 2020, 2,237 incarcerated persons and 277 staff members became infected with the virus. In addition, 28 incarcerated persons and one staff member died as a result of complications from COVID-19. In contrast, Corcoran, likely because it is a much newer prison consisting mostly of cells with solid doors, experienced a much smaller outbreak. An animated graphic displaying the progression of the COVID-19 outbreaks coursing through the various housing units at San Quentin and Corcoran after the transfers had been effected can be viewed on our website at www.oig.ca.gov.

Our review also found that when staff became aware of the positive test results shortly after the incarcerated persons arrived, both prisons failed to properly conduct contact tracing investigations. According to San Quentin, there were too many positive cases over a short period of time to conduct contact tracing. In addition, Corcoran staff failed to identify any contacts other than those living in cells adjacent to those of the incarcerated persons who tested positive. By failing to thoroughly conduct contact tracing, the prisons may have failed to alert some close contacts of the infected individuals, increasing the risk of further spread of the virus.

Since the transfers, CCHCS and the department have taken multiple actions to better safeguard incarcerated persons transferring between prisons, including implementing procedures requiring prisons to conduct COVID-19 testing of transferring incarcerated persons no more than five days before the transfer, followed by a rapid test on the day of the scheduled transfer. We did not review the adequacy of the additional steps taken by CCHCS and the department, but if consistently carried out, they should help prevent future disasters such as the one detailed in this report. Nonetheless, on December 31, 2020, the department reported 8,507 active cases of COVID-19 among its incarcerated population and 4,333 active cases among staff. In addition, tragically, the department reported COVID-19-related deaths of 130 incarcerated persons and 11 staff members. Therefore, CCHCS' and the department's arduous task of containing the virus within its prisons remain unfinished.

50.     The Third report summary further explains that nurses at CIM questioned packing untested inmates on buses to San Quentin, including by email asking: "What about Patient [sic] safety? What about COVID precautions?" The report concludes, "The decision to transfer the medically vulnerable incarcerated persons despite such outdated test results was not simply an

oversight, but a conscious decision made by prison and CCHCS executives." (OIG Report, p. 2).

On information and belief, those "prison and CCHCS executives" include all Defendants herein.

51.     As a result of this public health debacle at San Quentin, on February 1, 2021, Cal-

OSHA cited the CDCR and San Quentin with 14 violations, including five groups of violations that

were "serious" and four that were "willful-serious." The conduct generating these violations

included, for example, creating grave dangers to employees in numerous ways in the face of the

known San Quentin COVID-19 outbreak and related risks described herein, including choosing

not to provide training; choosing not to provide testing despite the wide availability of tests;

choosing not to  provide adequate and proper PPE despite the wide availability of PPE; refusal to

provide employees with legally required respirators at least as effective as N-95 respirators;

failing to provide adequate soap in an employee restroom; ignoring the duty to have legally

required policies and procedures to prevent the spread of airborne infections; choosing not to

transfer infected inmates to outside facilities when Defendants did not have legally required

isolation facilities on-site; refusing to de-contaminate vehicles used to transport COVID infected

inmates, to the hospital, not keeping track of COVID-infected employees or investigating

exposure incidents; willfully transferring COVID-infected inmates between housing units; willfully

refusing to isolate inmates transferred to San Quentin from the California Institute for Men in cells

with solid doors; willfully refusing to isolate COVID-infected inmates; refusing to contact the local

health officer; refusing to implement all public health measures recommended by the local health

officer; failing to exclude COVID-positive employees from their work assignments; allowing

COVID-positive staff to complete their work shifts; failing to ensure that Airborne infection

isolation rooms were operational to treat COVID positive patients; failing to identify a line of

authority for administering the Aerosol Transmissible Disease Exposure Control Plan; omitting

correction facilities from the Aerosol Transmissible Disease Exposure Control Plan; failing to

establish an adequate surge procedure, including work practices, engineering controls, temporary isolation facilities, decontamination facilities, stockpiling of respiratory equipment and PPE, and how the facility will interact with the local and regional emergency plan; implementing PPE requirements that were incompatible, inconsistent, and inadequate, and failing to state which tasks were N95, PAPR, or higher-level protection; failing to specify whether airborne infection isolation rooms (AIIR) were present, used, or tested as required; failing to specify provisions for the transfer of airborne infectious disease cases to suitable facilities when an AIIR is not available; failing to have effective decontamination procedures and engineering controls for the cleaning and decontamination of vehicles used to transport patients with suspect or confirmed airborne infectious diseases; failing to have exposure-incident provisions that start with developing a list of all potentially infected employees (as required by 5199(h)(6)) and failing to specify how exposure investigations will include the facility population, contractor employees, and employees of CDCR and CCHCS; placing responsibility for the decision to return to work following an exposure incident on the employee, rather than on a designated physician or other licensed health care provider; willfully maintaining ineffective work practices for isolation, quarantine, and infection control procedures, such as failing to dedicate staffing in accordance with public health guidance and assigning employees to work in housing units with and without COVID-19 cases; willfully transferring suspect and confirmed cases between housing units; willfully failing to isolate inmates transferred from CIM in closed door cells; willfully maintaining ineffective isolation and quarantine procedures during operation of mental health groups and exercise yard programs for inmates, without isolating suspect or confirmed COVID-19 cases; refusing to provide face shields and eye protection to all employees with direct exposure to infected inmates and coworkers; failing to ensure an adequate supply of latex and nitrile gloves for employees who worked with inmates despite the wide availability of gloves; choosing not to

29

require or provide physical distancing, permitting employees and inmates to go without face coverings; requiring inmate workers to travel between infected housing units to assigned work locations, potentially exposing staff to COVID-19; running an industrial fan in infected housing units; failing to establish written procedures for disinfection of shared items; mixing COVID-infected inmates with other inmates in non-infected tiers; permitting employees in the dental unit to perform aerosol-generating procedures on COVID-positive inmates without effective engineering controls to prevent the spread of COVID-19; failing to provide and ensure that employees used respirators at least as effective as N95 when exposed to suspect and confirmed COVID-19 cases, including not requiring staff to wear respirators during the transfer of inmates arriving from CIM; refusing to properly store N95 respirators in all transport vehicles; failing to provide medical evaluations for employees needing respirators; failing to fit test all staff with occupational exposure risk to suspect and confirmed COVID-19 cases, and failing to maintain records of fit testing for all such employees; failing to ensure employees exposed to suspect and confirmed COVID-19 cases were notified, tested, and referred to a physician or licensed health care provider; willfully failing to conduct exposure investigations in accordance with MCPH guidelines; willfully failing to isolate and quarantine inmates and employees exposed to suspect and confirmed COVID-19 cases in accordance with public health guidelines; willfully failing to provide centralized surveillance testing for the SARS-CoV-2 virus for employees with an occupational exposure risk in May and June of 2020 in accordance with public health guidelines; refusing to make COVID testing readily available; and choosing not to train employees about COVID-19, about their occupational exposure risk, and about the use of N95 respirators and the limitation of face coverings.

52.     On information and belief, Defendants and their delegees knew or must have known that Plaintiff had multiple high-risk factors for COVID-19, including but not limited to (1)

Heart Disease requiring surgical implantation of a Pace Maker; (2) High and Low Blood Pressure; (3) Arrhythmia Patient; and (4) advanced age (71 years old at the time of the incident). On information and belief, each Defendant had knowledge Plaintiff's risk factors from sources such as Plaintiff's medical records. Finally, based on the general prevalence of each of these risk factors in the general population and among CDCR prison staff, it was obvious that a high percentage of San Quentin inmates would have had two or more of these risk factors, as Plaintiff did.

53.     On information and belief, Plaintiff became infected with COVID-19 around June 20, 2020, at which time Plaintiff began experiencing the following symptoms among others, consistent with COVID-19: bad and persistent cough; shortness of breath, chest pain and major fatigue; nausea; fever, interspersed with cold spells and night sweats; lethargy and trouble getting out of bed; lack of appetite; full body aches and joint pain; decreased sense of smell and taste for approximately seven days; diarrhea; brain fog and forgetfulness; fear of dying; anxiety; depression; and, moodiness.

54.     Each Defendant's deliberate indifference to the danger created by their actions placed inmates at SAN QUENTIN, including Plaintiff, at a heightened risk for serious harm, and caused Plaintiff's injuries. Defendants, through their shocking indifference and recklessness, not only caused the suffering and pain for Plaintiff, but also caused unnecessary worry and anxiety for Plaintiff's siblings, family and friends.

55.     At all material times and, alternatively, the actions of each Defendant were intentional, and/or wanton, and/or willful, and/or conscience-shocking, and/or reckless, and/or callous, and/or grossly negligent, and/or negligent.

56.     As a direct and proximate result of each Defendant's acts and/or affirmative decisions not to act as set forth above, Plaintiff sustained the following injuries and damages, past and future, including, but not limited to:

a. Personal physical injuries and physical sickness.
b. Emotional distress from the violations of his personal constitutional rights, including grief, anxiety, worry, anger, humiliation, and indignity;
c. Loss of enjoyment of life.
d. All other legally cognizable special and general damages;
e. Violations of state and federal constitutional rights; and,
f. All damages, punitive damages, and penalties recoverable under 42 U.S.C. §§1983 and 1988, 29 U.S.C. §793, California Civil Code §§52 and 52.1, and as otherwise allowed under California and United States statutes, codes, and common law.

57.     As a direct and proximate result of each Defendant's acts as set forth above, Plaintiff sustained the following injuries and damages, past and future, including, but not limited to:

a. Conscious pain and suffering, pursuant to federal civil rights law;
b. All damages, punitive damages, and penalties recoverable under 42 U.S.C. §§1983 and 1988, 29 U.S.C. §794, California Civil Code §§52 and 52.1, and as otherwise allowed under California and United States statutes, codes, and common law; and
c. Cruel and Unusual Punishment in violation of the Eighth Amendment to the United States Constitution.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (42 U.S.C. §1983)
### PLAINTIFF v. DEFENDANTS DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, AND DOES 1-20

58.     Plaintiff re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth herein.

59.     By the actions described above, Defendants RALPH DIAZ, ESTATE OF ROBERT S. THARRATT, RONALD DAVIS, RONALD BROOMFIELD, CLARANCE CRYER, ALISON PACHYNSKI, M.D., SHANNON GARRIGAN, M.D., LOUIE ESCOBELL, R.N., MUHAMMAD FAROOQ, M.D., KIRK TORRES, M.D., and DOES 1-20, acting under the color of state law in

their individual capacities, deprived Plaintiff of the rights, privileges, and immunities secured by the First, Eighth and Fourteenth Amendments by subjecting him, or through their deliberate indifference, allowing others to subject him, to obviously dangerous conditions created by their affirmative actions that greatly increased Plaintiff's exposure and risk to a serious communicable disease, causing him to contract COVID-19, interfering with Plaintiff's right to familial association, right to be free from state-created danger, and ultimately causing his injuries.

60.     The listed Defendants knew-as described throughout this Complaint-that, due to aggravating factors including heart disease requiring surgical implantation of a Pace Maker; high and low blood pressure; arrhythmia; and advanced age (he was 71 years old at that time), Plaintiff faced significant risk of serious harm from exposure to COVID-19. Defendants each further had actual knowledge of the grave danger to inmates, their families, and the community posed by a potential, and by the actual, COVID-19 outbreak at San Quentin, and of the reasonable, necessary, and feasible care and public health mandates to prevent such an outbreak. Defendants further had a duty not to place Plaintiff in a position of obvious or known danger created by their affirmative acts.

61.     The listed Defendants actively ignored, delayed, and/or denied urgently needed measures and care necessary to maintain SAN QUENTIN free from State-created danger, placing inmates in a position of significantly enhanced danger of COVID-19 exposure. As a result of the Defendants' deliberate indifference to dangerous conditions created by their affirmative acts, Plaintiff suffered damages and deprivation of constitutional rights, as described herein.

62.     By the actions described above, the individually named Defendants violated 42 .S.C §1983, depriving Plaintiff of the following well-settled constitutional rights that are protected by the First, Eighth and Fourteenth Amendments to the U.S. Constitution:

    a. Plaintiff's right to be free from exposure to a known or obvious danger created by state actors, acting with deliberate indifference to that danger, as secured by the Due Process Clause of the Fourteenth Amendment.

    b. Plaintiff's right to be free from Cruel and Unusual Punishment as secured by the Eighth Amendment.

63.    The listed Defendants are liable for their individual conduct and decisions, for their conscious and deliberate failures to intervene, prevent, or stop the constitutional violations by others when Defendants were in a position to so intervene as such violations were occurring, and for their supervisory decisions that caused their subordinates to violate Plaintiff's rights.

64.    Defendants subjected Plaintiff to their wrongful conduct, depriving Plaintiff of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiff and others would be violated by their acts.

65.    As a proximate result of the foregoing wrongful acts, Plaintiff sustained injuries and damages, as set forth above, in ¶¶ 53, 56-57. Plaintiff is, therefore, entitled to compensatory damages in an amount to be proven at trial.

66.    In committing the acts alleged above, the individually named Defendants and DOE Defendants acted maliciously, oppressively, and/or with reckless disregard for the rights and safety of Plaintiff and others, and by reason thereof, Plaintiff is entitled to punitive damages and penalties allowable under 42 U.S.C. §1983, and other state and federal law against the individual Defendants. Plaintiff does not seek punitive damages against the STATE OF CALIFORNIA, CDCR, and SAN QUENTIN.

67.    Plaintiff is also entitled to reasonable costs and attorney's fees under 42 U.S.C. §1988 and other applicable California codes and laws.

## SECOND CAUSE OF ACTION
### (42 U.S.C. §1983-Supervisory Liability)
### PLAINTIFF v. DEFENDANTS DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, AND DOES 1-20

68.    Plaintiff re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth herein.

69.    Plaintiff allege, upon information and belief, the unconstitutional actions and/or omissions of the individually named Defendants and/or others acting on behalf of Defendants CDCR and SAN QUENTIN were pursuant to the following customs, policies, practices, procedures and official decisions of CDCR and/or SAN QUENTIN, stated in the alternative, which were made, directed, approved, encouraged, allowed, and/or ratified, in the face of obvious and/or known dangers posed by such procedures and decisions, by policymaking officials for CDCR and/or SAN QUENTIN, including, but not limited to, Defendants CDCR Secretary RALPH DIAZ, ESTATE OF ROBERT S. THARRATT, San Quentin Warden RONALD DAVIS, San Quentin Acting Warden RONALD BROOMFIELD, San Quentin CEO CLARANCE CRYER, San Quentin Chief Medical Executive ALISON PACHYNSKI, M.D., San Quentin Chief Physician and Surgeon SHANNON GARRIGAN, M.D., CIM CEO LOUIE ESCOBELL, R.N., CIM Chief Medical Executive MUHAMMAD FAROOQ, M.D., CIM Chief Physician and Surgeon KIRK TORRES, M.D., and DOES 1-20:

      a. To require, approve, allow, and/or encourage the transfer of inmates to and/or within SAN QUENTIN without proper testing, screening, distancing, masking, PPE, isolation or quarantine, or taking other appropriate precautions to prevent and limit the introduction and spread of COVID-19 at SAN QUENTIN, with deliberate indifference to the rights and safety of inmates and others;

      b. To refuse to properly and adequately classify, isolate or quarantine, test, and/or monitor inmates who were transferred to SAN QUENTIN, tested positive for COVID-19, were exposed or suspected of being exposed to COVID-19, or experienced symptoms consistent with COVID-19, with deliberate indifference to the rights and safety of inmates and others;

remain incarcerated without providing legally required N-95 respirators, appropriate PPE, and enforcing social strict distancing and sanitation;

n. To reject or refuse to enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs a through m above, when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiff and the public, and in the face of an obvious need for such policies, procedures, and training programs;

o. To cover up violations of constitutional rights by any or all of the following:

    i. By refusing to provide the OIG with relevant and requested documentation concerning how Defendants created and addressed the COVID-19 outbreak at SAN QUENTIN;

    ii. by improperly investigating and/or evaluating complaints or incidents related to the decisions, customs, policies, practices, and procedures described throughout this Complaint and above in subparagraphs a through n;

    iii. by ignoring and/or improperly and inadequately investigating and disciplining unconstitutional, unlawful, and high-risk activity within the CDCR and SAN QUENTIN as described throughout this Complaint and above in subparagraphs a through n;

    iv. by allowing, tolerating, and/or encouraging CDCR and/or SAN QUENTIN personnel to untimely, incompletely, or inaccurately report information regarding positive COVID-19 tests and cases among inmates at SAN QUENTIN;

    v. by other means as may become apparent in this litigation.

70.    As supervisors, Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20 further failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline other individually named Defendants, DOES 1-20, and other CDCR and SAN QUENTIN personnel under their supervision, with deliberate indifference to Plaintiff's constitutional rights, which were thereby violated as described above.

71.    As supervisors, Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20, despite the fact that each knew or must have known about the grave dangers to

inmates posed by COVID-19 at San Quentin, each failed to properly supervise and train other

Defendants, CDCR, CCHCS, and San Quentin staff who were responsible to properly address

the COVID-19 pandemic, outbreak San Quentin, and the medical needs of and safety of San

Quentin inmates, and each permitted and failed to prevent the unconstitutional acts of other

Defendants and individuals under their supervision and control, with deliberate indifference to the

rights, safety, and serious medical needs of inmates, including Plaintiff. Each of these supervising

Defendants either directed his or her subordinates in conduct that violated Plaintiff's rights, OR

set in motion a series of acts and omissions by his or her subordinates that the supervisor knew

or reasonably should have known would deprive Plaintiff of rights, OR knew his or her

subordinates were engaging in acts likely to deprive Plaintiff of rights and failed to act to prevent

his or her subordinate from engaging in such conduct, OR disregarded the consequences of a

known or obvious training deficiency that he or she must have known would cause subordinates

to violate Plaintiff's rights, and in fact did cause the violation of Plaintiff's rights. Furthermore,

each of these supervising Defendants is liable in their failures to intervene in their subordinate's

apparent violations of Plaintiff's rights as further described below.

72.     The unconstitutional actions, choices and/or conduct of the individually named

Defendants, DOES 1-20, and other CDCR and SAN QUENTIN personnel as described above,

were approved, tolerated, and/or ratified by policy making officers for CDCR and SAN QUENTIN,

including Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER,

PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20. Plaintiff is

informed and believe, and thereupon allege, the details of this incident have been revealed to the

individually named Defendants and DOES1-20, authorized policy makers within the STATE OF

CALIFORNA, CDCR and/or SAN QUENTIN, and that the individually named Defendants and

DOES 1-20 have direct knowledge of the fact that Plaintiff and similarly situated inmates at SAN

THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL,

FAROOQ, TORRES, and DOES 1-20, in their individual capacities.


### THIRD CAUSE OF ACTION
### (Violation of Civil Code §52.1)
### PLAINTIFF v. DEFENDANTS DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, AND DOES 1-20

75.     Plaintiff re-allege and incorporate by reference each and every allegation contained

in this complaint, as though fully set forth herein.

76.     By their acts, omissions, customs, and policies, Defendants DIAZ, ESTATE OF

THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL,

FAROOQ, TORRES, and DOES 1-20, acting in concert/conspiracy, as described above, and with

threat, intimidation, coercion, and/or with reckless disregard for rights, violated Plaintiff's rights

under California Civil Code §52.1 and the following clearly established rights under the United

States Constitution and California Constitution and law:

    a. Plaintiff's right to be free from exposure to a known or obvious danger created by state actors, acting with deliberate indifference to that danger, as secured by the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment;

    b. Plaintiff's right to be free from wrongful government interference with familial relationships and his right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments to the United States Constitution; and

    c. The right to enjoy and defend life and liberty, and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, Section 1.

77.     Defendants' violations of Plaintiff's rights with deliberate indifference in and of

themselves constitute violations of the Bane Act.[2] Alternatively, separate from, and above and

---

[2] See Atayde v. Napa State Hosp., No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing M.H. v. City of Alameda, 90 F.Supp.3d 889, 899 (N.D. Cal 2013); see also Cornell v. City and County of San Francisco, Nos. A141016, A142147, 2017 Cal. App. LEXIS 1011 at *58, f.n. 32 (Cal. Ct. App. Nov. 16, 2017) (approving M.H., supra.); Reese v.

beyond, Defendants' attempted interference, interference with, and violation of Plaintiff's rights,

Defendants violated Plaintiff's rights by the following conduct, among other conduct, constituting

threat, intimidation, or coercion:

    a. Refusing help with COVID-19 testing for San Quentin staff and inmates from outside specialists;

    b. Refusing to test, and relying on outdated tests of, inmates scheduled for transfer from CIM to San Quentin;

    c. Transferring inmates from CIM to San Quentin who were exposed to, or infected with, COVID-19;

    d. Housing inmates from CIM who were exposed to, or infected with, COVID-19, in San Quentin's general population;

    e. Refusing to clean and sanitize San Quentin's housing units and repair West Block's exhaust system;

    f. Refusing to supply N-95 respirators, or the equivalent, to San Quentin inmates;

    g. Forcefully housing inmates infected with COVID-19 with uninfected inmates under threat of disciplinary action;

    h. Refusing to reduce San Quentin population by half pursuant to the *Von Staich* Court's ruling;

    i. Refusing to enforce mask and social distancing mandates;

    j. Requiring San Quentin general population inmates to double-cell in face of social distancing mandates;

    k. Requiring Plaintiff to remain incarcerated in conditions that Defendants created of unnecessarily heightened danger contracting a deadly communicable disease, upon pain of losing his life and/or suffering permanent physical and/or mental harm; and

    l. Intentionally and with deliberate indifference, doing and/or permitting subparagraphs (a) through (k) when it was obvious that in doing so, Plaintiff's would suffer grave harm and possibly lose his life.

    78.    As a direct and proximate result of the DIAZ, ESTATE OF THARRATT, DAVIS,

BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and

DOES 1-20s' violation of California Civil Code §52.1 and of Plaintiff's rights under the United

States and California Constitutions and law, Plaintiff sustained injuries and damages, and against

each Defendant named in this Count are entitled to relief as set forth above, in ¶¶ 64-67 and

punitive damages against all individual Defendants, and all damages and penalties allowed by

---

County of Sacramento, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (following Cornell); Rodriguez v. County of L.A., 891 F.3d 776, 799, 802 (9th Cir. 2018) (following Cornell).

California Civil Code §§52 and 52.1 and California law, including three times actual damages, and attorney's fees.

### FOURTH CAUSE OF ACTION
### (Violation of Rehabilitation Act)
### (29 U.S.C. §794)
### PLAINTIFF v. DEFENDANTS STATE OF CALIFORNIA, CDCR, AND SAN QUENTIN

79.     Plaintiff re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth herein.

80.     Congress enacted the RA upon a finding that "millions of Americans have one or more physical or mental disabilities" and that "individuals with disabilities constitute one of the most disadvantaged groups in society[.]" 29 U.S.C. §701(a).

81.     Section 504 of the RA prohibits discrimination against qualified individuals on the basis of disability under any program or activity receiving Federal assistance, 29 U.S.C. §794(a). For purposes of Section 504, "program or activity" includes, among other things, all the operations of "a department agency, special purpose district, or other instrumentality of a State or local government" or "the entity of such State or local government that distributes such assistance and each such department or agency … to which the assistance is extended, in the case of assistance to a State or local government[.]" 29 U.S.C. §794(b).

82.     On information and belief, Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN received Federal assistance and funds and are covered instrumentality of a State and a department agency for the purpose of enforcement of Section 504 of the Rehabilitation Act. 29 U.S.C. §794(a)-(b).

83.     At all material times, a person (1) Heart Disease requiring surgical implantation of a Pace Maker; (2) High and Low Blood Pressure; (3) Arrhythmia Patient; and (4) advanced age,

Plaintiff was an "individual with a disability" with medical impairments that were substantial impediments to his daily life, as defined under the RA, 29 U.S.C. §705(20)(A). On information and belief, through their employees and agents, Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN had knowledge of Plaintiff's disabilities, from sources such as Plaintiff's medical records. Finally, based on the general prevalence of each of these disabilities and COVID risk factors in the general population and among CDCR inmates, it was obvious that a high percentage of San Quentin inmates, would have had two or more of these risk factors.

84.     As an "individual with a disability," Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN were required to make reasonable accommodations for Plaintiff's disabilities, such as providing additional enhanced PPE, providing legally required N-95 respirators, changing the prison environment, sanitation and deep cleaning of the prison, eradicating vermin from the housing unit, black mold remediation, single cell housing to allow for social distancing, enforcing social distancing and masking mandates, and following well-known public health directives, Orders, and advice (as described herein) to properly address the COVID-19 pandemic outbreak at San Quentin.

85.     Because of the aforementioned acts and omissions of the individual Defendants and others, working as employees and/or agents of Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN, the COVID-19 virus invaded nearly every corner of SAN QUENTIN, placing Plaintiff at grave risk. Defendants CDCR and SAN QUENTIN failed to reasonably accommodate Plaintiff's disabilities as required by law, placing him at increased risk of contracting a serious communicable disease for which his disabilities made highly susceptible to grave harm and possible death. By failing to reasonably accommodate his disability needs, Defendants CDCR and SAN QUENTIN, on behalf of the STATE OF CALIFORNIA, discriminated against Plaintiff, effectively forcing him, as an unlawful condition of his lawful prison sentence, to

be subjected to even a greater risk of contracting and dying from COVID-19 than his non-disabled inmate cohorts.

86.     As a result of the acts and misconduct of Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN complained of herein, Plaintiff contracted the COVID-19 Coronavirus, suffered immensely, is now suffering, and will continue suffer damages and injuries as alleged above. Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorney's fees as set forth above, in ¶¶ 64-67. Plaintiff does not seek punitive damages against Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN.

### FIFTH CAUSE OF ACTION
#### (Negligent Infliction of Emotional Distress)
#### (29 U.S.C. §794)
#### PLAINTIFF v. DEFENDANTS DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, AND DOES 1-20

87.     Plaintiff re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth herein.

88.     At all material times, DEFENDANTS DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20 owed Plaintiff the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

89.     At all material times, each Defendant owed Plaintiff the duty to act with reasonable care.

90.     These general duties of reasonable care and due care owed to Plaintiff by all Defendants include, but are not limited, to the following specific obligations:

  a. To refrain from placing Plaintiff in a position of heightened danger created by Defendants' actions taken with deliberate indifference to that danger;

44

   b. To refrain from abusing their authority granted to them by law;

   c. To refrain from subjecting Plaintiff to an increased risk of contracting COVID-19 by their reckless and deliberately indifferent choices to subject Plaintiff to a high risk of contracting the virus; and,

   d. To refrain from violating Plaintiff's rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

91. Defendants, through their acts and omissions, breached the aforementioned duties owed to Plaintiff.

92.    By the acts and omissions set forth more fully in the paragraphs above, Defendants acted negligently and breached their duty of due care owed to Plaintiff, which foreseeably resulted in injury and the suffering of damages by Plaintiff.

93.    Defendants' negligence, as described herein, proximately caused Plaintiff to sustain injuries and damages, and against each listed Defendant in this Count, Plaintiff is entitled to the relief described above, in ¶¶ 64-67. Plaintiff also seek punitive damages against each listed Defendant in their individual capacities.

## **REQUEST FOR RELIEF**

Wherefore, Plaintiff respectfully request the following relief against each and every Defendant herein, jointly and severally:

1. Declaratory relief, finding that Defendants violated Plaintiff's rights, to serve the purpose of 42 U.S.C. §1983, 29 U.S.C. §794, and Cal. Civil Code §§52 and 52.1, including for vindication of those rights, elucidation of those rights for the courts, the public, and government officials, and to deter similar wronging by the Defendants and other officials;

2. Compensatory damages in an amount according to proof, which is fair, just, and reasonable;

3. Punitive damages under 42 U.S.C. §1983, federal law and California law, in an amount according to proof, which is fair, just, and reasonable against all Defendants except the state entity Defendants;

4. All other damages, penalties, costs, interest, and attorney's fees as allowed by 42 U.S.C. §§1983 and 1988; California Civil Code §§52 and 52.1 et seq.; and as otherwise may be allowed by California and/or Federal law; and

5. For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby respectfully demand a jury trial in this action on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully Submitted,

December 20, 2021

_____
Lovell Colvin